UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHITECRYPTION CORPORATION,<br>      Plaintiff,<br><br>         v.<br><br>ARXAN TECHNOLOGIES, INC.,<br>      Defendant. | Case No. 15-cv-00754-WHO<br><br>**ORDER REGARDING MOTION TO DISMISS**<br>Re: Dkt. No. 66 |

**INTRODUCTION**

Counter defendants whiteCryption Corporation and Intertrust Technologies Corporation seek to dismiss Arxan Technologies Inc.'s counterclaims for interference with contractual relations, prospective economic advantage, and violation of California's Unfair Competition Law because Arxan failed to plausibly allege facts sufficient to state a claim against either counter defendant. whiteCryption also seeks to dismiss the claim for declaratory judgment as simply a mirror of its own causes of action. Intertrust further seeks dismissal because Arxan has not pleaded viable alter ego and agency theories of liability, and does not assert direct allegations against Intertrust in its breach of contract cause of action.

For the most part, Arxan's counterclaims mush the counter defendants' alleged actions together. For the reasons stated below, I agree with Intertrust that the alter ego and agency allegations are insufficient and STRIKE the legal conclusions asserting them from the counterclaims. I also find that the breach of contract, interference with the Moss Adams contract and declaratory relief causes of action are not plausibly stated against Intertrust, and dismiss Intertrust from them. And I DENY the motion to dismiss concerning the claims against

whiteCryption and the remaining claims against Intertrust.[1]

## BACKGROUND

Arxan's principal business is providing application protection and anti-tamper solutions for a variety of commercial software. First Amended Counterclaims ("FACC") ¶ 18. Among other things, Arxan provides a product commonly referred to as "code-hardening" software which enables developers and security engineers to protect an application by inserting "guards" into the code. *Id.* Arxan's software is often licensed to customers for periods of time with the goal that the customer will be interested in renewing the license. *Id.* ¶ 21.

In mid-2011, Arxan began negotiations with Intertrust regarding a reseller relationship whereby Arxan would sell Intertrust's recently acquired software protection technology, whiteCryption's White Box Cryptography product, to its customers under one of Arxan's own labels, TransformIT. *Id.* ¶¶ 24, 27. After a few test transactions, Arxan and whiteCryption entered into a reseller agreement (the "Reseller Agreement") under which Arxan obtained a nonexclusive distribution license for the White Box Cryptography product. *Id.* ¶ 29. The Reseller Agreement was drafted, negotiated, and signed on behalf of whiteCryption by William Rainey, the Senior Vice President, General Counsel, and Secretary for Intertrust, as Secretary for whiteCryption. *Id*. ¶ 30. Arxan sold the whiteCryption security software under its TransformIT label from June 2011 to June 2013. *Id*. ¶ 35.

Arxan alleges that whiteCryption breached various obligations under the Reseller Agreement. One "critical" component of the Reseller Agreement was whiteCryption's obligation to provide software maintenance and support services as defined by the agreement. *Id.* ¶ 48. In July 30, 2013, approximately two months after the Reseller Agreement ended, Tala Shamoon, Intertrust's Chief Executive Officer, informed Arxan that whiteCryption would no longer honor its obligation to provide ongoing maintenance and support for remaining customers for the length of their existing contracts with Arxan. *Id.* ¶ 52. Arxan contends that this constituted a violation of

---

[1] Because I realized that it would take me longer to finish this opinion than is my custom, I issued a short order on May 19, 2016 granting the motion to dismiss as to Arxan's alter ego and agency theories against Intertrust but denied it as to the causes of action asserted against whiteCryption. Dkt. No.86. This Order explains my reasoning and addresses additional related issues.

the express terms of the Reseller Agreement that affected Arxan as well as over twenty of its customers. *Id.* ¶ 54.

The Reseller Agreement also allegedly prohibited whiteCryption from unauthorized direct contact with Arxan's customers. *Id.* ¶ 55. In contravention of this agreement, whiteCryption contacted at least three of Arxan's customers and "demanded that they stop using whiteCryption's products that were properly provided by Arxan." *Id.* ¶ 56. whiteCryption and Intertrust also breached the agreement by publically disclosing that the White Box Cryptography product sold under Arxan's brand was actually whiteCryption's technology. *Id.* ¶¶ 59, 62. As a result, at least one customer asked for pricing information to determine whether to purchase from counter defendants directly and another customer began to negotiate a non-disclosure agreement with Intertrust so that it could discuss its needs directly with Intertrust. *Id*. ¶¶ 63-64.

In November 2013, whiteCryption retained Moss Adams LLP to conduct an audit pursuant to the Reseller Agreement which provided certain limited inspection rights. *Id.* ¶ 77. Arxan and Moss Adam executed an Auditor Non-disclosure Agreement (the "NDA") that provided that Moss Adams would not disclose any confidential information it received from Arxan to whiteCryption or third parties. *Id.* ¶ 80. Thereafter Arxan provided confidential customer information to Moss Adams in order to facilitate the audit process. *Id.* ¶ 83. Despite the requirements of the NDA, Moss Adams did not provide Arxan with its final report five days before providing the report to whiteCryption so that it could insure that none of its confidential information was included. *Id.* ¶ 91. Instead, Moss Adams emailed whiteCryption and Arxan at the same time with a copy of the final report that contained highly confidential information belonging to Arxan, including customer names and pricing. *Id.* ¶¶ 89, 92. Arxan alleges Intertrust and whiteCryption "intentionally induced" Moss Adams to breach the NDA to obtain Arxan's confidential customer information and gain a competitive advantage in the marketplace. *Id.* ¶ 95.

Arxan's counterclaims encompass six causes of action: (1) breach of contract; (2) intentional interference with contractual relations- relationships with customers; (3) intentional interference with contractual relations – Moss Adams Contract; (4) intentional interference with prospective economic advantage; (5) violation of California Business and Professions Code §

3

17200 *et. seq*. (the "UCL"); and (6) a claim declaratory judgment claim. Arxan asserts that Intertrust should be held liable not only for its own actions but also for whiteCryption's conduct on the basis of an alter ego or agent theory of liability. *Id.* ¶¶ 102-113.

**LEGAL STANDARD**

**I.   MOTION TO DISMISS**

To survive a motion under Federal Rule of Civil Procedure 12(b)(6), the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*. While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

**II.   HEIGHTENED PLEADING STANDARD FOR FRAUD OR MISTAKE**

Claims sounding in fraud or mistake are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires that such claims "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this standard, a plaintiff must identify "the time, place, and content of [the] alleged misrepresentation [s]," as well as the "circumstances indicating falseness" or "manner in which the representations at issue were false and misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547-48 (9th Cir. 1994)

(internal quotation marks and modifications omitted).  The allegations "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).

## DISCUSSION

Counter defendants argue that all claims against Intertrust and that all but one claim, the breach of contract claim, against whiteCryption should be dismissed.[2]  Intertrust contends that it cannot be held liable under an alter ego or agency theory, but does not otherwise attempt to differentiate its arguments about the insufficiency of the complaint from whiteCryption's.

## I.  INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS – CUSTOMER RELATIONSHIPS

To state a claim for intentional interference with contractual relations, a plaintiff must show: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.  *Pac. Gas & Elec. Co. v. Bear Stearns & Co*., 50 Cal. 3d 1118, 1126 (1990).

Counter defendants' motion regarding the Second Cause of Action focuses on the fourth element.  They argue Arxan has failed to allege facts demonstrating an actual breach or disruption of any then existing contractual relationships.  Mot. at 4 [Dkt. No. 66].  Under California law, an express breach is unnecessary to state a claim for the tort of inducing breach of contract.  *Ramona Manor Convalescent Hosp. v. Care Enters*., 177 Cal. App. 3d 1120, 1131 (Ct. App. 1986). "Rather, liability may be imposed where the defendant does not literally induce a breach of contract, but makes plaintiff's performance of the contract more expensive or burdensome." *Solyndra Residual Trust, by & through Neilson v. Suntech Power Holdings Co*., 62 F. Supp. 3d

---

[2] Counter defendants seek to dismiss any claims in so far as they are based on plaintiffs' allegation that they "misus[ed] Arxan's software to launch a competitive code-hardening product." FACC ¶ 69.  Arxan does not respond to this argument.  Considering the identified representation is a minor isolated reference to software misuse, I do not read this allegation as supporting any of the counter claims.  If Arxan intended to rely on a theory of software misuse by counter defendants, they should have clearly alleged so.

1027, 1048 (N.D. Cal. 2014) (internal quotation marks omitted).

Arxan claims that "Counter-Defendants contacted key decision makers of [Arxan's] customers and demanded that they terminate existing contracts with Arxan or not renew their Arxan contracts." FACC ¶ 70. The complaint provides several examples of the counter defendants' alleged interference. For example, in March 2013, Oliver Mills, General Manager of Intertrust Europe, "directly approached Arxan customers in an effort to convince them to replace Arxan products with Intertrust product(s)." *Id*. ¶ 71. A month later "a representative of Intertrust approached an officer of one of Arxan's customers, in an effort to pressure it to purchase white-box cryptography directly from Intertrust." *Id*. ¶ 72. The customer later informed Arxan that he was "confused and extremely offended by Intertrust's conduct." *Id*. "Indeed, after informing one Arxan customer about the reseller relationship, that customer began to negotiate a non-disclosure agreement with Intertrust so that the customer could discuss their needs and pricing directly with Intertrust." *Id*. ¶ 64. Similarly, in or around the third quarter of 2013, "whiteCryption threatened several of Arxan's customers and demanded that they stop using whiteCryption products" and "further demanded that Arxan's customers sign a new contract with whiteCryption in order to keep using the white-box cryptography product that was provided by Arxan." *Id*. ¶ 73. As a result of counter defendants' interference, a number of existing Arxan customers either terminated existing contracts, did not renew their contracts, or chose not to enter into contracts with Arxan. *Id*. ¶ 5.

These allegations are sufficient to support a reasonable inference that such actions constituted a disruption of Arxan's contracts with its customers. Counter defendants' motion to dismiss this claim is DENIED.

**II.    INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS – NDA**

Counter defendants contend that Arxan's Third Cause of Action should be dismissed because Arxan alleges "nothing more than efforts by whiteCryption to enforce its existing contractual rights under [] the Reseller Agreement." Mot. at 4.

The Reseller Agreement provides whiteCryption with a limited right to inspect and audit

Arxan's records. RJN, Exh. A [Dkt. No. 67].[3] Under the terms of the Reseller Agreement, Arxan agreed to cooperate with whiteCryption by providing it "access to the relevant records, data, information," etc. *Id.* In order to protect confidential information from disclosure to whiteCryption and third parties, Arxan entered into the NDA with Moss Adams and relied on it to provide documents for the audit. FACC ¶ 83. Arxan alleges that the NDA did not modify any of its obligations under the Reseller Agreement and that counter defendants acknowledged this fact in an email to Arxan. *Id*. ¶¶ 80, 93. But despite counter defendants' knowledge of the NDA, whiteCryption insisted that Moss Adams have access to all documents without redaction and ultimately induced Moss Adams to breach its contractual obligations by providing counter defendants with Arxan's confidential customer information in an effort to gain a competitive advantage over Arxan. *Id*. ¶¶ 81, 94-95.

Arxan has plausibly pleaded that whiteCryption intended to interfere with its contractual relations with Moss Adams. The counter claims meet the pleading requirements, as provided in the previous section, by plainly alleging that: (1) Arxan and Moss Adams had a valid contract, the NDA; (2) whiteCryption was aware of the NDA; (3) whiteCryption induced Moss Adams to breach the contract in order to gain a competitive advantage; (4) the breach caused the disclosure of Arxan's confidential information; and (5) Arxan suffered damage as a result. *Id*. ¶¶ 133 - 135.

whiteCryption's reliance on *Lawless v. Brotherhood of Painters, Decorators & Paperhangers of America*, 143 Cal. App. 2d 474 (1956) does not alter this conclusion. In *Lawless*, cross-complainant Herbert Sorrell alleged that an international union unjustifiably induced the breach of his employment contract with the local union when the international instituted a prosecution against him. 143 Cal. App. at 477. The prosecution resulted in Sorrell's suspension and made him ineligible to hold office with the local union. *Id*. Sorrell argued that his suspension was unlawful and that the parent union unjustifiably induced the breach of his employment contract with the local union.

---

[3] Because the Reseller Agreement is incorporated by reference into the complaint and its authenticity has not been questioned, I consider it for the purposes of this motion. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

The *Lawless* court held that the parent union was not liable for interference with contractual relations because "[o]ne who is in a confidential relationship with a party to a contract is privileged to induce the breach of that contract." *Id*. at 478. whiteCryption relies on this language to argue that it was similarly privileged to induce a breach of the NDA because it was only attempting to enforce the terms of the Reseller Agreement. But *Lawless*'s analysis is premised on the notion that a "server may induce his master to breach a contract with a third person." *Id*. The court reasoned that because the relationship between an international union and a local union are "close and interwoven, having common objectives and existing under the same system of internal laws and management" their relationship was akin to that of master-servant. *Id*. Multiple courts have cabined *Lawless*'s finding to analogous situations in which the parties have a close or interdependent relationship. *See, e.g.*, *Pasadena Unified Sch. Dist. v. Pasadena Fed'n of Teachers*, 72 Cal. App. 3d 100, 111 (1977) ("In *Lawless*, the local was simply an organ of the international union, with no real separate existence. The international could not, therefore, be charged with interference with itself. No such relationship exists between the union and its members who obviously have a separate existence."); *Kozlowsky v. Westminster Nat'l Bank*, 6 Cal. App. 3d 593, 599-60 (1970) (characterizing *Lawless* as a "manager's privilege case" and finding it inapplicable); *Aalgaard v. Merchants Nat'l Bank, Inc.*, 224 Cal. App. 3d 674, 685 n.9 (1990) (explaining that *Lawless* "simply states a servant is privileged to induce breach of a master's contract without any discussion of the factual context.").

Whether an actor's conduct is privileged involves a consideration of numerous factors. *See* Restatement (Second) of Torts § 767 (1979) (setting forth the factors to be considered in making that determination including the interferer's motive, the interests sought to be advanced, the social interest in protecting the freedom of the action, and the relationship between the parties); *see also Kentucky Cent. Life Ins. Co. v. LeDuc*, 814 F. Supp. 832, 840 (N.D. Cal. 1992) ("Finally, the determination whether the interference is privileged involves consideration of numerous factual matters."). Neither party has addressed these factors in their briefing. Arxan and whiteCryption are competitors in the same market and do not share a master-servant or manager-subordinate type relationship. Arxan does allege that the NDA did not alter Arxan's obligation under the Reseller

Agreement, that the released customer information was protected under the NDA, that it was not necessary to the audit, and that whiteCryption induced the disclosure in order to gain a competitive advantage. *See* FACC ¶¶ 80-83, 93-95. These allegations go further than simply conveying whiteCryption's desire to enforce the terms of the Reseller Agreement and support a plausible claim that whiteCryption interfered with Arxan's NDA with Moss Adams in order to gain access to the confidential information. *See Ariba, Inc. v. Rearden Commerce, Inc.*, No. 11-cv-01619-EDL, 2011 WL 4031140, at *8 (N.D. Cal. Sept. 8, 2011) (refusing to dismiss a counterclaim for interference with contractual relations despite the existence of a contract between the parties because "[d]efendants have alleged more than a breach of contract, including, among other things, that [plaintiff's] conduct was intentionally aimed at disrupting the merger, which it saw as a competitive threat"). This states a plausible claim against whiteCryption. whiteCryption's motion to dismiss this claim is DENIED.

On the other hand, there are no allegations that Intertrust induced Moss Adams to breach its contract with Arxan. For reasons discussed later, the alter ego and agency allegations are insufficient. Accordingly, Intertrust's motion to dismiss this claim is GRANTED.

### III. UCL CLAIM

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Each of these three adjectives captures a separate and distinct theory of liability." *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (quotation marks omitted). The UCL's "coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law." *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012).

#### A. Unlawful Prong

The "unlawful" prong of the UCL "borrows violations of other laws and treats them as independently actionable." *Daugherty v. Am. Honda Motor Co., Inc.*, 51 Cal. Rptr. 3d 118, 128 (Ct. App. 2006). This includes common law torts. *Cortez v. Global Ground Support, LLC*, No. 09-cv-4138-SC, 2009 WL 4282076, at **2-3 (N.D. Cal. Nov. 25, 2009).

The Ninth Circuit has held that intentional interference with contractual relations is

sufficient to establish a UCL claim. *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1107 (9th Cir. 2007). Because Arxan adequately pleaded counter defendants' intentional interference with Arxan's customer relationships and whiteCryption's intentional interference with the NDA, it has likewise sufficiently pleaded a UCL claim against counter defendants under the unlawful prong. *See Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc*., No. 10-cv-03428-LHK, 2011 WL 1044899, at *11 (N.D. Cal. Mar. 23, 2011) ("Because the Court has found that Brocade adequately stated a claim for interference with contract, it likewise finds that Brocade has adequately alleged a UCL violation based on this predicate act.").

### B. Fraudulent Prong

A defendant violates the "fraudulent" prong of the UCL by engaging in conduct by which "members of the public are likely to be deceived." *Davis v. HSBC Bank Nevada, N.A*., 691 F.3d 1152, 1169 (9th Cir. 2012). "'Likely to deceive' implies more than a mere possibility that the advertisement might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner. Rather, the phrase indicates that the [representation] is such that it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Garcia v. Sony Computer Entm't Am., LLC*, 859 F. Supp. 2d 1056, 1062 (N.D. Cal. 2012). The heightened pleading standard of Rule 9(b) applies to UCL claims that are "grounded in" or "sound in" fraud. *Kearns v. Ford Motor Co*. (9th Cir. 2009) 567 F3d 1120, 1125. "To satisfy Rule 9(b), a pleading must identify the 'who, what, when, where, and how' of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc*., 637 F.3d 1047, 1055 (9th Cir. 2011).

Arxan's relied upon allegations do not satisfy Rule 9(b)'s heightened standard. It alleges that an Intertrust representative made public misrepresentations falsely implying that all of Arxan's products were actually Intertrust products. FAC ¶¶ 62, 75. However, the counterclaims do not explain what the statements actually were or how they falsely implied that Arxan's products were Intertrust's products. In addition, Arxan contends that counter-defendants "falsely told Arxan customers that whiteCryption code-hardening technology could replace Arxan code-

hardening technology" and improperly stated that "their customer agreements with Arxan were invalid in order to convince customers to terminate their relationship with Arxan." *Id*. ¶¶ 73, 74. These allegations fail to provide with specificity: (1) who made these statements, utilizing only a generalized reference to "counter defendants"; (2) when they were made, providing only that these were made during some of "these" customer interactions without much clarity as to the time frame; and, relatedly, (3) which customers were affected by these statements.

Accordingly, Arxan has not adequately pleaded a UCL claim under the "fraudulent" prong.

### C.    Unfair Prong

In cases involving unfairness to competitors, the California Supreme Court has defined "unfair" as "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co*., 20 Cal. 4th 163, 187 (1999).

Counter defendants argue that Arxan fails to tether its allegations of unfairness to any violation of antitrust law or any threat to competition. Arxan's primary opposition is based on its view that because it has successfully established a violation of the UCL under the "fraudulent" prong, it has also established a violation under the "unfair" prong. But Arxan identifies nothing its counterclaims that demonstrates an emerging violation of antitrust law or significant threat to competition. While whiteCryption's actions may have harmed Arxan's own business interests, such harm does not demonstrate injury to competition. *See id.* at 186 ("Injury to a competitor is not equivalent to injury to competition; only the latter is the proper focus of antitrust laws"); *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1119 (C.D. Cal. 2001) (to establish claim under the "unfair" prong of the UCL a plaintiff must show a significant threat of harm to competition, not merely harm to the plaintiff's own commercial interests).

In sum, Arxan may proceed on its UCL claim under the "unlawful" prong in the Fifth Cause of Action. Counter defendants' motion to dismiss this claim is DENIED.

11

## IV. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

Arxan also brings the Fourth Cause of Action for intentional interference with prospective economic advantage based on allegations that counter defendants contacted Arxan's customers, disclosed the terms of the Reseller Agreement, and made false representations about Arxan's products in order to disrupt Arxan's relationships with its customers and unfairly compete with Arxan. FACC ¶¶ 140-142. The elements of an interference with prospective economic advantage claim are: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *CRST Van Expedited, Inc.*, 479 F.3d at 1108. The primary difference between the intentional interference with prospective economic advantage and intentional interference with contractual relations is that interference with prospective economic advantage requires a plaintiff to allege an act that is wrongful independent of the interference itself. *Id.* "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003).

Counter defendants attack Arxan's claim for interference with prospective economic advantage on the basis that Arxan fails to allege a wrongful act independent from the interference itself. But the Ninth Circuit has held a violation of the UCL can serve as the wrongful act necessary to support an intentional interference with economic advantage claim. *CRST Van Expedited, Inc.*, 479 F.3d at 1109. While this may appear to create an end run around the "independent act" requirement, the Ninth Circuit squarely considered this functional merger of the two torts and found it to be consistent with the requirements of California law. *See id.* at 1110 ("We are aware that our reasoning works a practical merger of the two common law torts of intentional interference with existing contract and intentional interference with prospective economic relationships, where the two are alleged to coexist along with a contemporaneous and

12

derivative UCL violation" but find it to be consistent with California Supreme Court decisions.).

Because Arxan has successfully pleaded a UCL claim against counter defendants, as well as fulfilling the other requirements of an interference with prospective economic advantage claim, counter defendants' motion to dismiss this claim is DENIED.

## V.   ALTER EGO OR AGENCY LIABILITY

Intertrust moves to dismiss all claims to the extent its liability rests on alter ego or agency liability. It is "a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal citations and quotations omitted). It is the unusual circumstance in which a parent corporation will be held directly or indirectly liable for the acts of its subsidiaries. *E. & J. Gallo Winery v. EnCana Energy Services, Inc.*, 2008 WL 2220396, at *5 (E.D. Cal. May 27, 2008). Federal courts in California have recognized three such situations: "where the circumstances of the organization of the two entities are such that the corporate form should be disregarded ("alter ego" liability);" "where the subsidiary acts as an agent of the parent corporation;" or "where the parent corporation aids, abets, or ratifies the acts of the subsidiary corporation." *Id.* Here, the parties focus on only two of the three theories of liability, alter ego and agency. I address each one below.

### A.   Alter Ego

"The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests." *Mesler v. Bragg Mgmt. Co.*, 39 Cal.3d 290, 300 (1985). The doctrine has two elements: (1) "there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist" and (2) "there must be an inequitable result if the acts in question are treated as those of the corporation alone." *Sonora Diamond Corp. v. Super. Ct. of Tuolumne Cnty.*, 83 Cal. App. 4th 523, 538 (2000).

With regard to the first prong, courts look to a number of factors including "commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and

employees," "use of one as a mere shell or conduit for the affairs of the other," "inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers." *Id.* at 538-39. No one characteristic governs. "[T]his test requires a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former" and "envisions pervasive control over the subsidiary, such as when a parent corporation dictates every facet of the subsidiary's business – from broad policy decisions to routine matters of day-to-day operation." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015) (internal quotation marks omitted). "Total ownership and shared management personnel are alone insufficient to establish the requisite level of control." *Id.*

Arxan alleges that Intertrust and whiteCryption share the same headquarters, officers, directors, and other employees. FACC ¶¶ 103-105. Additionally, many of the emails produced during early discovery exchanged between the parties revealed emails from individuals with an Intertrust-related email address discussing whiteCryption's products. *Id.* ¶ 107. These emails showed that individuals such as Tala Shamoon and Walt Marcinkiewicz, who facially have no role in whiteCryption, were involved in conversations or decisions related to whiteCryption including: changing whiteCryption's website, pricing whiteCryption's new products, identifying customers for whiteCryption to pursue, monitoring whiteCryption's transactions, approving the withholding of technical support from Arxan, and negotiating issues with Arxan in relation to the Reseller Agreement. *Id.* ¶¶ 111, 113.

While these allegations establish Intertrust's significant involvement in whiteCryption's operations, they are insufficient to establish alter ego liability. A "plaintiff does not meet the unity of interest and ownership prong when the evidence shows only an active parent corporation involved directly in decision-making about its subsidiaries' holdings, but each entity observes all of the corporate formalities necessary to maintain corporate separateness." *Ranza*, 793 F.3d at 1073. Here, there are no allegations of commingled funds, undercapitalization, or the disregard of corporate formalities.

Arxan analogizes its case to that of *Toho-Towa Co. v. Morgan Creek Prods., Inc.*, 217 Cal. App. 4th 1096, 1109 (2013) and *Monaco v. Liberty Life Assur. Co.*, No. 06-cv-07021-MJJ, 2007

WL 1140460 (N.D. Cal. Apr. 17, 2007). However, both are meaningfully distinguishable. In *Toho*, the California Court of Appeal held that there existed substantial evidence to support the trial court's finding that the relevant parties, Morgan Creek Productions ("MCP"), B.V. and Morgan Creek International Ltd. ("Ltd."), were part of a single business enterprise. The evidence included that:

> The entities were all owned by the same person, who was the sole decision maker for all of the Morgan Creek entities; the three entities exploited the same assets; the 'work' of B.V. and Ltd. was performed by the employees of MCP,…. and although B.V. entered into contracts which required that monetary payments be made to them, no money was remitted, but rather was transferred directly to Ltd.'s lender.

*Toho-Towa Co,* 217 Cal. App. 4th at 1109. The court found that this evidence supported the conclusion that "MCP so dominated the finances, policies and practices of B.V. and Ltd. that the latter had no separate 'mind, will or existence' of their own, but were merely conduits through which MCP conducted its business." *Id.* Here, the counter claims lack allegations that Intertrust was the sole decision maker for Arxan, that all or the majority of whiteCryption's work was performed by Intertrust employees, or that money intended for whiteCryption was transferred directly to Intertrust or its debtors.

Additionally, with regard to the second prong, the *Toho* court also found that it would be inequitable to uphold B.V.'s separate existence because although the plaintiff had been assured there would be sufficient assets to pay it any money due under its agreement, the plaintiff was not told that "B.V.'s financial operations were structured by MCP in such a way that it never received any money from its licensees, and thus would not have funds to meet its payment obligations under the agreement." *Id.* at 1109. Here, no such payment structure is alleged. Arxan's only allegation towards this prong simply alleges that an inequitable result will follow if counter defendants are treated as separate entities because "much of the alleged misconduct was performed by Intertrust officers or employees directly or with the approval of these Intertrust individuals." FACC ¶ 114. Even if true, this allegation does not approximate the allegations at issue in *Toho* and is insufficient to satisfy this prong. *See also Orosa v. Therakos, Inc.*, No. 11-cv-2143-EMC, 2011 WL 3667485, at *7 (N.D. Cal. Aug. 22, 2011) ("Merely alleging that Plaintiff

15

will suffer an inequitable result if [a third party] is not a defendant is not sufficient.") (citing cases).

Arxan's reliance on *Monaco* is similarly unpersuasive. Reviewing the plaintiff's complaint, the *Monaco* court identified a litany of factual allegations that supported a finding of unity of interest between defendant Liberty Life and its parent organization Liberty Mutual including:

> Liberty Mutual controlled and managed Liberty Life's claims operation such that the entities acted as a single company []; Liberty Mutual is the parent company of Liberty Life and owns 90% of Liberty Life []; the entities share a common corporate headquarters address []; the entities are part of Liberty Mutual's holding company structure []; Liberty Mutual fully guarantees the insurance policy and annuity contract obligations of Liberty Life []; the entities share services of personnel, equipment, telephone, computers, and other business machines []; Liberty Mutual markets Liberty Life's products []; the entities share a common chairman of their respective boards []; the entities share several other officers []; five of the seven directors of Liberty Life are also directors of Liberty Mutual []; the entities share a common web page []; Liberty Mutual employs the claims personnel who handle Liberty Life disability claims []; Liberty Mutual handles Liberty Life disability administrative appeals []; Liberty Life and Liberty Mutual share the same computer system []; Liberty Mutual provides training for Liberty Life's claims employees []; Liberty Life's Claims Procedure Manual indicates that Liberty Mutual prepared or participated its preparation []; Liberty Life's Claims Procedure Manual refers to "Liberty" without drawing a distinction between Liberty Mutual and Liberty Life []; Liberty Mutual's logo appears in numerous locations in Liberty Life's Claim Procedure Manual []; the entities use the same agent for the service of process []; the entities use the same counsel []; the entities use the same logo[]; Liberty Life's operations are integrated with its parent via an administrative services agreement with all employees maintained by Liberty Mutual [].

*Monaco*, 2007 WL 1140460, at *5. Here, Arxan's allegations are not nearly as numerous or detailed and lack many of the allegations the *Monaco* court relied on. For example, Arxan does not allege that the two corporations act as single company, that Intertrust fully guarantees whiteCryption's contracts or obligations, that Intertrust trains whiteCryption employees, or that the two entities share the same telephones, computers, and other systems.

Even if Arxan's allegations satisfied the "unity of interest" prong, it has not met its burden

on the second prong. As described above, Arxan's sole allegation that an inequitable result would follow simply because Intertrust's employees engaged in or approved the alleged misconduct is insufficient. *See Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1117 (C.D. Cal. 2003) ("California courts generally require some evidence of bad faith conduct on the part of defendants before concluding that an inequitable result justifies an alter ego finding."); *Leek v. Cooper*, 194 Cal. App. 4th 399, 418 (2011) (holding that plaintiff must plead "some conduct amounting to bad faith that makes it inequitable for [the defendant] to hide behind the corporate form").

### B. Agency Liability

"The independence of a subsidiary from the parent corporation is to be presumed." *E. & J. Gallo Winery*, 2008 WL 2220396, at *5. However, a subsidiary company may be considered an agent of the parent corporation where "the parent so controls the subsidiary as to cause the subsidiary to be [sic] become merely the instrumentality of the parent." *Pantoja v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 1177, 1192 (N.D. Cal. 2009) (citation omitted). To meet this standard, "the parent must be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's *day-to-day* operations in carrying out that policy." *Barrous v. BP P.L.C.*, 10-cv-02944-LHK, 2011 WL 4595205, at *4 (N.D. Cal. Oct. 3, 2011) (citation omitted) (emphasis in original). An agency relationship may also be established by showing that "the subsidiary performs services that are sufficiently important to the [parent] corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *Id.* (internal quotations omitted).

While Arxan's amended counter claims add further factual allegations regarding the relationship between whiteCryption and Intertrust, including information gleaned in discovery, Arxan still has not sufficiently established agency liability. Arxan claims Intertrust employees were "heavily involved in whiteCryption's day-to-day business functions." FACC ¶ 109. It relies on whiteCryption employees' use of @intertrust email addresses, Shamoon's role in making branding decisions, approving the withholding of technical support, and communicating with

Arxan in relation to the Reseller Agreement, and Marcinkiewicz's involvement in naming whiteCryption's products, identifying whiteCryption customers, pricing its products, and developing marketing strategies. *Id.* ¶¶ 107, 111, 113. Although Arxan characterizes these activities as constituting "day-to-day" operations, beyond the use of Intertrust associated email addresses, the acts appear to be more consistent with higher level policy and strategy decisions. *See Sonora Diamond Corp.*, 83 Cal. App. 4th at 541 (control must be "so pervasive and continual that the subsidiary may be considered nothing more than an agent or instrumentality of the parent, notwithstanding the maintenance of separate corporate formalities"); *Wallis v. Centennial Ins. Co., Inc.*, 2013 WL 3803971, at *4 (E.D. Cal. July 19, 2013) (plaintiffs survived a motion to dismiss because they alleged facts establishing that the parent company's control over the subsidiary was "pervasive and continual"). Agency requires more than "the degree of direction and oversight normal and expected from the status of ownership." *Sonora Diamond Corp.*, 83 Cal. App. 4th at 540. Accordingly, I find the allegations insufficient to establish agency liability.

Arxan seeks to hold Intertrust liable under the First Cause of Action for breach of contract solely on the basis of its alter ego and agency theories. Because of the insufficiency of those theories, Arxan has not stated a claim against Intertrust for breach of contract.

## VI. DECLARATORY RELIEF

The Sixth Cause of Action for declaratory relief is only stated against whiteCryption, which argues that Arxan's request for a declaratory judgment merely mirrors whiteCryption's claims against it and thus should be dismissed. Mot. at 17. Arxan does not respond to this argument.

Declaratory relief is a remedy available "at the discretion of the district court." *Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 396 (9th Cir. 1982). Under the Declaratory Relief Act, a court may "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. While a district court may exercise its discretion to dismiss a counterclaim for declaratory relief when it is redundant of the complaint's claims or affirmative defense, "this should only be done where the counterclaim truly serves no useful purpose in addition to the claims in the

complaint." *Allstate Ins. Co. v. Pira*, No. 11-cv-3511-CW, 2012 WL 1997212, at *5 (N.D. Cal. June 4, 2012) (internal quotation marks omitted). "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. Indeed, "[t]he safer course for the court to follow is to deny a request to dismiss a counterclaim for declaratory relief unless there is no doubt that it will be rendered moot by the adjudication of the main action." *Fourth Age Ltd. v. Warner Bros. Digital Distribution Inc.*, No. 129912ABCSJHX, 2013 WL 11316952, at *3 (C.D. Cal. July 11, 2013).

Because the extent to which Arxan's requested declaratory relief and whiteCryption's complaint are perfectly aligned is better assessed at a later stage in the litigation, whiteCryption's motion to dismiss the declaratory relief claim is DENIED.

## CONCLUSION

I DENY the motion to dismiss with respect to the causes of action asserted against whiteCryption. I GRANT it regarding the First and Third Causes of Action against Intertrust without leave to amend, STRIKE the legal conclusions alleged regarding the alter ego and agency theories, and DENY the remainder of the motion.

**IT IS SO ORDERED**.

Dated: June 15, 2016

WILLIAM H. ORRICK
United States District Judge